United States District Court      Southern District of Texas

| | |
|---|---|
| Juanita DeHart, § <br> § <br>     Plaintiff, § <br> versus § <br> § <br> Baker Hughes Oilfield § <br> Operations, Inc., *et al.*, § <br> § <br>     Defendants. § | Civil Action H-04-2233 |

# Opinion on Summary Judgment

1. *Introduction.*

A woman was fired. She says it was because of her race and participation in a discrimination investigation. Her employer says that she was fired for her inability to work with others. It has moved for summary judgment and will prevail.

2. *Background.*

In April 2000, Baker Hughes Oilfield Operations, Inc., hired Juanita DeHart as a drafter. That year, DeHart received a favorable performance review and a raise. In October, DeHart first complained about the air quality in the office – a grievance she would raise throughout her time at Baker. By 2001, her evaluations began to decline, noting deficiencies in teamwork and communication.

In January 2002, DeHart said that pollution from construction at the plant interfered with her breathing and prevented her from working. She took a thirty-five day leave of absence. Baker responded by buying an air filter, moving her work station, and hiring a technician to test the air.

In July, DeHart says that she told a director, Brent Emerson, that she and another employee, Ron Sinnette, were being discriminated against because they were black. Specifically, she said that managers would not work with them. DeHart blames this conversation for her declining reviews and termination. Emerson denies that the conversation occurred.

In May 2003, DeHart took an unauthorized, twenty-seven-day leave of absence for respiratory problems. She said that construction dust, exhaust fumes from trucks, and a coworker's cologne forced her to leave. In response, her supervisors moved her to the other side of the building, ordered new cleaning fluids, purchased another air filter, prohibited the use of dry-erase markers, and repeatedly tested the air.

On June 8, because of her poor performance and attitude, Baker told DeHart that she would not receive a raise that year. The next day, she took another unauthorized, fourteen-day leave of absence. Her manager, Doug Murray, told her that she would be fired if she remained off work after June 16 without a medical authorization. Although DeHart never furnished the authorization and did not return until June 23, still she was not fired.

The next month, during her third evaluation, DeHart again was criticized for her bad attitude and poor attendance. At the meeting, she alluded to having been the object of sex and race discrimination. A supervisor later sent DeHart a memorandum asking for details about the incident. DeHart refused to respond unless the supervisor was more "specific about the statement I made regarding race and gender." (Jt. Chron. 4.) She never furnished data to support her comments, leaving the company with no complaint to address.

On August 15, Baker issued DeHart a written warning for being (a) insubordinate; (b) argumentative; and (c) excessively absent. DeHart blames the reprimand on her having talked to an Equal Employment and Opportunity Commission investigator that morning about a co-worker's complaint. She says that she told Brent Emerson about the phone call immediately when she arrived to work. Again, Emerson denies the conversation. DeHart has not offered evidence from the commission showing that she was ever contacted.

That afternoon, DeHart e-mailed her response to the warning to her supervisors and the chief executive officer . In her message she wrote nothing about the telephone interview with the commission. The next morning, DeHart e-mailed the chief executive officer again, saying that she had had the interview but that she had not told her immediate managers or human resources about it.

On September 2, 2003, DeHart filed a complaint with the Commission. She claimed that Baker retaliated against her for participating in the commission's

investigation by giving her a poor performance review for 2003 and the written warning of August 15, 2003.

On April 19, 2004, DeHart was fired. That day, she left the office, she says, because someone was wearing cologne that made her ill. Baker said that it fired DeHart because she was disruptive and unable to work with others.

On May 5, 2004, she sued, alleging that Baker discriminated against her based on her race and disability and that it fired her wrongfully. On May 17, 2004, DeHart filed a second complaint with the commission, alleging retaliation and disability, sex, and race discrimination. She has since abandoned the claims based on her disability and sex.

3.  *Legitimate Firing.*

The company has offered a nondiscriminatory, non-retaliatory reason for the firing: DeHart was disruptive and uncooperative. The record is replete with specific data supporting this conclusion.

Throughout her employment, DeHart's performance evaluations steadily declined. She was absent at least 103 days in less than two years. DeHart conceded in her deposition that she repeatedly called a supervisor a liar, cried at work more than 300 times, accused Baker of "doctoring" the air quality reports, and caused two managers to change their positions just so they would not have to supervise her. On the other hand, the company indulged her – buying air filters and purifiers, requiring delivery trucks to stop their engines near the building, hiring air technicians, and moving her work station. It did this even though the tests proved that the air was fine.

The company meticulously took notes on the situation with DeHart. Hundreds of pages describe her complaints about air quality, but only one note reflects that DeHart complained about race. In response, the company promptly tried to investigate, but she ignored their request for details about the incident.

Further, there is no corroboration that (a) DeHart complained to Emerson in 2002, (b) the company knew about her participation in the Sinnette investigation, or (c) the company knew of her complaint to the Commission. DeHart may not create a fact issue with unfounded assertions.

The company could have fired her in May or June of 2003 for unauthorized absences. It did not. It could have fired her for insubordination for refusing the request

for details about her race discrimination claim. It did not. It could have fired her for constant complaints about the air. It did not. Instead, for three years, it tried to accommodate DeHart. Although the law does not require it, the company counseled her, advised her of her deficiencies, and adjusted the office to conform to her preferences about the air.

DeHart says that she "wouldn't blame them if they thought I was irrational." (DeHart Dep. 59.) DeHart concedes that the company's handbook states that workers may be fired for "inability or unwillingness to work harmoniously with other employees," and she was. Actual attendance and performance at work is important. A worker who is paid to draw plans for engineers, machinists, or assemblers is not productive when she spends her time fussing about the ventilation at her workplace, quarreling with co-workers, and insulting supervisors.

4.   *Race.*

DeHart claimed race discrimination in her compliant. Specifically, she said that black workers were not (a) given the same opportunities as others or (b) allowed to participate in group projects. DeHart claims that Baker prevented her from attending classes that were offered to other employees, she was denied pay when she participated in another class, and she was unable to prepare for class during work - like other employees did. She does not identify the class, the workers who did attend, or proof that she was eligible for the class. Emerson testified that DeHart attended a class on engineering but that she did not do well. (Emerson Dep. 79.) Still, she progressed to the next class. There, she chose to leave because, she said, the recently painted walls bothered her. (*Id.* 80.) Nothing suggests that race was a factor.

She also says that Baker prohibited her from attending a design meeting. Instead, she says, she and the other black person in her group had to work on subsidiary projects. Again, she furnished no minutes of the meeting, a complaint to her supervisor, or a statement from the other excluded worker. She says that her supervisor, Mills, refused to work with her. Later, she says that she would not blame Mills for not wanting to work with her after all of her complaints. She also said that Mills used "racial terms and stereotypes." The fact that Mills interviewed and hired DeHart rebuts this uncorroborated claim.

5. *Retaliation*.

To prevail on a retaliation claim, DeHart must prove that: (a) she engaged in protected activity, (b) an adverse employment action followed, and (c) her protected activity caused the company to take the adverse action. *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980).

DeHart argues that she engaged in several protected activities. First, she says that she complained of race discrimination in July 2002. This statement – if made – occurred over 300 days before DeHart filed her first complaint on September 2, 2003. She is, therefore, precluded from arguing it now. Second, she argues that she engaged in a protected activity when she suggested race and sex discrimination at her evaluation in 2003. She is wrong. DeHart abandoned whatever grievance that she may have had when she refused to give the details of her oblique accusation to her supervisor. Next, she says that she told Emerson about the commission interview. She thwarted this claim when she e-mailed the chief executive officer the following day and told him that she *did not* tell her supervisors about the meeting. The law recognizes only one of DeHart's acts: her filing a charge of discrimination in September 2003.

DeHart argues that the written warning, the poor performance review, and refusal to relocate her desk a third time are adverse employment actions. They are not. The law requires for employers to account only for significant events, like hiring, promoting, firing, and gross differentials in assignments and training. Her firing is an adverse employment action. 42 U.S.C. § 2000e-2(a)(1). Still, she must show a causal connection between her protected act and the firing. Here, the claim fails.

The record is clear that DeHart fabricated the discrimination claims because her air-quality complaints – the real reason for the adverse action – are not proper predicates for this or any other legal theory. For example, on May 28, 20003, Baker began recording interactions with DeHart. She posits that human resources created the investigatory file only in response to her race complaints. DeHart conveniently omits that this was also the same day that she returned from a one-month leave and the same day that she asked for her *third* relocation and the *first* time that Baker refused.

6. *Wrongful Termination.*

To have a wrongful termination claim in Texas, (a) the worker must have been given a direct order that was illegal, (b) the worker must have refused to obey the illegal order, and (c) the employer must have fired her as a consequence of that refusal. DeHart has never identified an illegal order that she was given. She says that because she had not used all of her sick-time, Baker should not have fired her for leaving work in April 2004. Baker fired her for years of complaints and insubordination, not because of the half-day of leave. Even if an employee has leave, she may not abandon her post. This is yet another unfruitful grasp.

7. *Conclusion.*

DeHart complained to the commission about discrimination and retaliation. The truth is, she was a difficult person; nothing suggests that she was mistreated because of her race, assistance to the commission, or complaint. If anything, the company nurtured a liability for too long. Companies cannot – and should not – cater to workers' hyper-sensitivities and preemptive complaints about discrimination.

The workplace is full of friction, discomforts, and hierarchy – that is why it is called work. DeHart will take nothing from Baker Hughes.

Signed November 8, 2005, at Houston, Texas.

_____
Lynn N. Hughes   USDJ
United States District Judge